UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                                                Case No.: 17-cr-20700
v.                                                      Honorable Gershwin A. Drain

LUCIAN MYLES,

      Defendant.
_____/

## **ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [#18]**

**I.    INTRODUCTION**

On October 19, 2017, the grand jury returned an Indictment against Defendant Lucian Myles for possession with intent to distribute codeine in violation of 21 U.S.C. § 841(a)(1), possession of a stolen firearm in violation of 18 U.S.C. § 922(j), and possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c).

Presently before the Court is the Defendant's Motion to Suppress Evidence, filed on February 19, 2018. In his present motion, Defendant argues that the Government failed to establish probable cause to search an apartment and car because there was no nexus between the purported criminal activity and the

locations to be searched. Defendant further asserts that probable cause was lacking because the information in the warrant's affidavit was stale. Lastly, Defendant maintains that the Government lacked a good faith belief that the warrant was reasonable.

The Government filed a Response in Opposition on March 12, 2018. Defendant did not file a Reply in support of his Motion to Suppress. A hearing was held on April 18, 2018. For the reasons that follow, the Court will grant the Defendant's Motion to Suppress.

## II. FACTUAL BACKGROUND

On July 16, 2017, a state court judge issued a search warrant for a Jeep Grand Cherokee driven by Defendant and for 3320 Spinnaker Lane, Apt. 6A, the apartment where Defendant and his girlfriend, Talena Cooper, resided. The Jeep was leased by J.S. Shelton, Cooper's uncle, and operated by the Defendant. The warrant was based on the affidavit of DEA Task Force Officer Brian Tillman, who had been investigating a suspected money laundering organization since January of 2017.

The property to be searched for and seized was described in the affidavit as follows:

> Any and all records (electronic or otherwise) tending to show the distribution of controlled substances or the accumulation, storage and laundering of drug proceeds in violation of State of Michigan law. To include all drug paraphernalia (i.e. diluents, packaging) and

2

equipment (i.e. scales, presses) used in the manufacturing/handling of controlled substances, lists and records pertaining to the manufacture, possession, ownership and/or sales of controlled substances, lists and records of possession and/or ownership and/or residency of the above places to be searched, guns and ammunition, currency and coins, money counters, cell phones and/or smart phones, computer devices, police monitoring equipment, and other items which are proceeds or items which were purchased with the proceeds of the sale of controlled substances and/or money laundering activities. Also to be seized are business, tax, travel, automobile and/or financial records. Any and all records tending to identify co-conspirators and the nature/scope of a drug conspiracy.

In his affidavit supporting the search warrant, Tillman explained that his investigation revealed that automobiles were fraudulently obtained and likely provided to individuals engaged in narcotics trafficking. The parties involved would fail to make payments on the vehicle to the legitimate lien holder and individuals associated with the drug trade would use the vehicles until they were seized by authorities or repossessed by the lien holder. One of the individuals involved in this scheme was Cooper, who ultimately led investigators to Defendant.

On March 3, 2017, the DEA learned that Cooper was driving a white Chevrolet Malibu that had been reported stolen by a local dealership. Cooper was arrested for driving on a suspended license and possession of a stolen vehicle. During questioning, Cooper indicated that her boyfriend, Defendant Myles, had obtained the car through a "scam" and that Defendant sometimes stayed at his friend's place in the Harbor Town Apartments.

In April of 2017, a search warrant was executed to help determine the relationship of those involved in the auto fraud conspiracy. CS1 was the initial target of the search warrant, and he agreed to cooperate with the DEA in the hope that he would receive a reduced sentence on any potential criminal charges. CS1 identified Defendant as a large scale drug trafficker residing in the Harbor Town Apartments. He provided Defendant's cellular telephone number to investigators. CS1 indicated that Defendant drove a Cadillac Escalade which had a hidden compartment in the center console. CS1 stated that Defendant hid a firearm and a large amount of money in the secret compartment. CS1 also informed investigators that Defendant is associated with numerous persons involved with laundering money, as well as selling oxycodone and codeine syrup in Ohio and Kentucky.

Tillman subsequently obtained utility records associated with Cooper and discovered that Cooper recently moved to a new apartment in the Harbor Town Apartment complex, located at 3320 Spinnaker Lane, Apt. 6A, Detroit, Michigan. Tillman opined that Cooper was serving as the renter nominee for Defendant, however the affidavit is silent as to the basis supporting this conclusion other than that in Tillman's training and experience, he has known drug traffickers to employ nominees for their residence and utilities.

In May of 2017, Tillman visited an Instagram account purportedly maintained by the Defendant. Tillman observed a photograph of 20 unopened 16

ounce plastic bottles of Promethazine Hydrochloride and Codeine Phosphate Syrup with gold chains and a high end men's watch around the bottle. The Instagram account also contained pictures displaying a large amount of currency and high end, customized diamond jewelry. Tillman's review also revealed that the Instagram account is associated with the same phone number provided by CS1. Tillman showed one of the pictures to CS1 who indicated that it was taken at Defendant's and Cooper's former apartment at the Harbor Town Apartment complex. In the picture, Defendant is holding bottles of codeine syrup and cash. On May 7, 2017, Tillman observed Defendant bragging on his Instagram account about acquiring a new vehicle, a Jeep Grand Cherokee.

Tillman obtained tax records for Defendant, as well as the company MCD ENT LLC, for which Defendant is the registered agent. MCD ENT LLC did not file any tax returns for tax years 2010 through 2016, and Defendant did not file any returns from 2011 through 2016. His return for 2010 showed an adjusted gross income of $7,000.00. MCD ENT LLC appears to be located at a single family residence with no connection to a business endeavor.

Tillman also conducted a criminal history search of Defendant, which revealed that Defendant was arrested in January of 2010 for Felony Dangerous Drugs. In October of 2010, Defendant was convicted of heroin distribution and sentenced to six months' probation.

In June of 2017, CS2, who had provided reliable intelligence in the past, informed investigators that Defendant was the leader of a drug trafficking organization called Team Eastside. CS2 is a paid informant. CS2 claimed that Team Eastside was the largest distributor of prescription narcotics in the city of Detroit. CS2 also asserted that "Associate 1" and Defendant were the primary members of Team Eastside. Tillman ran a criminal history check and learned that Associate 1 had been arrested in 2007 for felony robbery.

Also in June of 2017, CS3, another paid informant, told investigators that Defendant was a member of Team Eastside, which makes its money through the illegal sale of prescription narcotics in Ohio. CS3 further claimed that in December 2016 he observed Defendant sell heroin, however the affidavit is silent as to where the drug transaction took place.

Tillman also reviewed toll records from phone numbers associated with Defendant. Through this endeavor, Tillman learned that Defendant called a landline in the Harbor Town apartment complex 67 times between April 22, 2017 and May 21, 2017. Moreover, these records reveal that Defendant was in contact with "Associate 2," who is currently under investigation for prescription drug trafficking. Tillman believes that Defendant is a source of supply for "Associate 2," however he failed to articulate additional facts supporting his belief apart from Defendant's contact with him.

The toll records further reveal that Defendant contacted another individual associated with Shelton 24 times during the months of April and May 2017. Shelton has been a target of previous DEA investigations.

Tillman also learned through his review of the toll records that Defendant has been in contact with "Associate 3." The DEA has identified "Associate 3" as a trafficker of oxycodone and promethazine between Michigan and West Virginia. "Associate 3" pled guilty to felony assault in 2006. Defendant has also been in contact with "Associate 4," who has been identified as a member of Team Eastside. "Associate 4" has at least two arrests for violent offenses.

Tillman's review of the toll records also showed that Defendant communicated at least once with "Associate 5," who the DEA has identified as a multi-kilogram cocaine trafficker. On July 7, 2017, the DEA obtained information from CS4, who has known "Associate 5" for ten years. CS4 has never known "Associate 5" to have legitimate employment and is aware that "Associate 5" is closely connected to a drug trafficking organization in Detroit known as Made West. Made West distributes cocaine and heroin. CS4 is also a paid informant. He has provided information to the DEA in the past relative to unrelated investigations, which has led to the seizure of illegal drugs and proceeds.

Defendant's phone records also show that he has been in contact with "Associate 7," who was stopped at Metropolitan Airport in March of 2017.

"Associate 7" was carrying $15,924 in cash and attempting to travel to Miami, Florida. On at least one occasion, Defendant contacted "Associate 8," who is currently under investigation and has prior convictions for drug related offenses. Lastly, Defendant communicated at least once with "Associate 9," who also has prior narcotics trafficking convictions.

On June 27, 2017, the DEA obtained a tracker warrant from a state court on the Jeep Grand Cherokee. The tracker was placed on the vehicle on June 28, 2017 and tracked the vehicle's movements through July 4, 2017. The tracker revealed that the Jeep was observed near the addresses of three different individuals that the DEA suspects are involved with drug trafficking.

On July 5, 2017, police in Hamilton County, Ohio arrested CS5 and it was discovered that CS5 was carrying a backpack with $14,000 in cash. The vehicle driven by CS5 contained a suspicious amount of air fresheners, which Tillman explained in his affidavit are typically used by drug traffickers to mask the odor of narcotics. CS5 advised that he was a money courier for Defendant and typically transports money multiple times a day for Defendant. CS5 would be paid a portion of the money he transported. Tillman confirmed CS5 knew Defendant by viewing a video on CS5's phone depicting both CS5 and Defendant in what appeared to be the Jeep Grand Cherokee. Tillman also viewed a text message from Defendant to CS5 stating that CS5 could "[t]ake $2,400 out that's yours." Tillman surmised this

was in reference to CS5's courier commission.

Additionally, on July 5, 2017 at 11:30 p.m., and again on July 14, 2017 at 9:00 a.m., Tillman observed the Jeep Grand Cherokee parked in the Harbor Town Apartment complex.

### III. LAW & ANALYSIS

#### A. Probable Cause

The Fourth Amendment prohibits the issuance of a search warrant without probable cause. U.S. Const. amend. IV. Probable cause exists when there is "'a fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (quoting *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985)).

An affidavit supporting a search warrant must describe a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). "The critical element is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought." *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005)(internal quotation marks omitted). "[W]hether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of the

circumstances." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016)(citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013)).

Defendant maintains that the Government failed to demonstrate a reasonable basis upon which to conclude that the specific things to be searched for were located in either the Harbor Town apartment or the Jeep Grand Cherokee. There was no photographic evidence of drugs inside of the apartment. While CS1 reviewed a photograph suggesting illegal activity from Defendant's Instagram account and confirmed it was Defendant in the photograph, CS1 advised that the photograph was taken in an apartment that is no longer rented by Cooper. Moreover, none of the evidence discussed in the affidavit suggests any firsthand knowledge that Defendant keeps drugs or other contraband in his current residence. While CS3 claimed that he observed Defendant engaged in the sale of heroin, this fails to establish a nexus between the heroin and the currently-rented Harbor Town apartment. Additionally, this occurred seven months before the execution of the search warrant.

Lastly, that CS5 was found with a large amount of cash and claimed to be a money courier for Defendant does not provide sufficient nexus that drugs or other evidence of illicit activities would be present in the apartment. Defendant maintains that the Government appears to be relying on Defendant's purported

status as a drug dealer to support the search warrant, which has been rejected as adequate to demonstrate a fair probability that drugs will be found in a home. *See Frazier,* 423 F.3d at 533; *Brown*, 828 F.3d at 383 ("We have never held, however, that a suspect's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home.") (internal quotation marks omitted).

Similarly, Defendant asserts that there is no evidence establishing a nexus between the alleged illegal activity and the Jeep Grand Cherokee. While CS1 claimed that Defendant kept cash and a gun in a secret compartment in another vehicle, there is absolutely no indication that the Jeep Grand Cherokee also had a secret compartment.

The Government counters that the magistrate judge had a substantial basis for concluding that there was a nexus between Defendant's suspected criminal activity and the Jeep Grand Cherokee and the Harbor Town apartment. The Government asserts that law enforcement had detailed, long-standing, and reliable evidence that Defendant was involved in money laundering and drug trafficking based on his contact with other criminals and that his lifestyle could not be sustained based on his reported income. The Government suggests that it is likely that the high-end jewelry observed in photographs on Instagram were located in the apartment, which evidences Defendant's money laundering to hide his drug

trafficking activities.

Contrary to the Government's argument, there was insufficient nexus between Defendant's purported criminal activity and the apartment or the vehicle. The affidavit supporting the warrant did not connect any purported illegal drug trafficking with either the currently-rented Harbor Town apartment or the Jeep. While the affidavit was lengthy, it mainly consists of speculation and conjecture. The Government relies on *United States v. Williams*, 544 F.3d 683 (6th Cir. 2008), wherein the Sixth Circuit held that in "cases involving a variety of suspected crimes, [] an issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." *Id*. at 688 (citation omitted).

However, in a more recent Sixth Circuit case, which appears to be at odds with *Williams*, the court held that "if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *United States v. Brown*, 828 F.3d 375, 384 (2016). The *Brown* court examined the Sixth Circuit's precedent concerning the nexus requirement and "searches related to drug trafficking[,]" to conclude that suppression should have likewise been granted in the defendant's case. *Id.* at 382-85.

Similar to the facts in *Brown*, the search warrant affidavit in the present case "contain[s] no evidence that [Defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." *Id*. at 382. Additionally, like the *Brown* defendant, none of the DEA's confidential informants have indicated that Defendant sold drugs to them from his home, nor did Tillman conduct any surveillance of the currently-rented Harbor Town apartment and observe activity indicative of drug trafficking. *Id.*

In rejecting the Government's assertion in *Brown* that the magistrate judge could infer drugs would be located at a drug dealer's home, the *Brown* court explained that "status as a drug dealer" plus "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence" is required to find a sufficient nexus for probable cause purposes. *Id*. at 383. Specifically, the *Brown* court explained that "we have required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id.*

Here, the record is devoid of any evidence, much less reliable evidence that Defendant uses his current residence for drug dealing. None of the confidential informants claimed that Defendant engaged in drug trafficking from his home or witnessed him sell drugs near his home. The majority of Tillman's affidavit details information provided by CS1, however this information not only fails to provide a

nexus between drug trafficking and Defendant's current residence, it is also stale. "[S]tale information cannot be used in a probable cause determination." *United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009). Evidence of drug trafficking becomes stale quickly "because drugs are usually sold and consumed in a prompt fashion." *Id.* at 378. While CS1 asserted that photographs on Defendant's Instagram page showed Defendant with drugs, a large amount of cash and high-end jewelry, these photographs were taken several months prior to the execution of the warrant and when Defendant resided in a different apartment. Similarly, in addition to a lack of nexus between Defendant's purported criminal activity and his residence, CS3's observation of Defendant selling heroin in an unidentified location some seven months before the execution of the search is stale information and cannot provide probable cause for this separate reason.

Moreover, the staleness of the evidence in Tillman's affidavit demonstrates that the Government's reliance on *Williams, supra,* is misplaced because the facts in that case are distinguishable from the facts present here. In *Williams*, the defendant argued that there was insufficient nexus between the handguns at issue and his residence. *Williams*, 544 F.3d at 686-87. In rejecting this argument, the Sixth Circuit held that it was reasonable for the magistrate judge to infer that the handguns would be found in the defendant's residence because officers had corroborated statements made by two informants that the *Williams* defendant

possessed two handguns, which he had used just two weeks prior to the subject search to rob a drug dealer. *Id.* at 684, 688. Additionally, the *Williams* defendant had been arrested for carrying a concealed weapon a month prior to the search of his home. *Id.* at 685, 688. As such, the Sixth Circuit found that "[g]iven the evidence that Williams possessed multiple guns, and had recently used them to further his criminal activity, the issuing judge could have reasonably inferred that Williams kept at least one handgun at his residence." *Id.* at 688. The staleness of Tillman's photographic evidence from a prior apartment, a seven-month old drug transaction at an unidentified location and a 2010 conviction for selling heroin distinguishes this case from the recent evidence supporting the affidavit in *Williams*.

There is also no evidence that Defendant used the Jeep Grand Cherokee in furtherance of any drug trafficking activities. While CS1 indicated that Defendant kept a gun and large amounts of cash in a hidden compartment in the vehicle he formerly used, there is no evidence that the Jeep Grand Cherokee was also used to hide proceeds or contraband associated with the drug trade. The video evidence purportedly showing CS5 and Defendant sitting in the Jeep Grand Cherokee does not establish a nexus between Defendant's criminal activities and the vehicle. Rather, it merely shows that CS5 is acquainted with the Defendant. Additionally, the tracker evidence does not provide sufficient nexus between narcotics trafficking

and the Jeep Grand Cherokee. This tracker evidence is best described as "vague, generalized, and insubstantial[,] which does not support a finding of probable cause for the search. *Carpenter*, 360 F.3d at 594.

For all of these reasons, Officer Tillman's affidavit failed to establish the requisite nexus between Defendant's purported narcotics trafficking with his apartment or his vehicle.

### B. Exception to the Exclusionary Rule

Even in cases in which the warrant is later found to be invalid, courts will not suppress evidence found as a result of that warrant where police conduct is pursued in good faith. *United States v. Leon*, 468 U.S. 897, 918-927 (1984). Suppression is warranted however when "the affidavit is so lacking in indicia of probable cause" that "belief in its existence [is] entirely unreasonable." *Carpenter*, 360 F.3d at 595. In order for the good faith exception to apply, the affidavit must set forth "a minimally sufficient nexus between the illegal activity and the place to be searched." *Id.*

Here, the warrant is completely devoid of any facts suggesting that Defendant deals drugs, keeps contraband or other indicia of drug trafficking in his current residence. Tillman failed to surveil Defendant's home other than to establish that on two occasions, he apparently slept at the apartment. Nor did Tillman attempt to set up any controlled purchases at or near the apartment. The

affidavit before this Court can best be described as a fishing expedition based on speculation and conjecture. CS3's observation that Defendant sold heroin seven months earlier at an unidentified location, Defendant's 6 ½ year-old conviction for selling heroin and his communications with suspected drug traffickers are not "probative of whether [Defendant] was using his current residence for drug trafficking." *Brown*, 828 F.3d at 385.

Officer Tillman was required to make some attempt to connect the purported drug trafficking with the apartment and the Jeep. This he failed to do. As such, the affidavit was "so lacking in indicia of probable cause that Tillman's belief in its existence was "entirely unreasonable." *Carpenter*, 360 F.3d at 595. As such, application of the good faith exception is unwarranted here.

## IV. CONCLUSION

For the reasons articulated above, the Defendant's Motion to Suppress [#18] is GRANTED.

SO ORDERED.

Dated: April 25, 2018 /s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 25, 2018, by electronic and/or ordinary mail.
/s/ Tanya Bankston
Deputy Clerk